**MUNCIE NOVELTY CO., Petitioner,**

v.

**DEPARTMENT OF STATE
REVENUE, Respondent.**

No. 49T10–9602–TA–00011.

Tax Court of Indiana.

Dec. 1, 1999.

Richard Kammen, James T. Flanigan, McClure, McClure & Kammen, Indianapolis, Indiana, Attorneys for Petitoner.

Jeffrey A. Modisett, Attorney General of Indiana, Terry G. Duga, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Respondent.

FISHER, J.

Muncie Novelty Co. (MN) appeals the final determinations of the Department of State Revenue (Department) finding that MN owed Gaming Card Excise Tax (GCET) in the amount of $110,333.29 for the 1992 and 1993 tax years. MN also appeals a $5,000 civil penalty levied against it by the Department for failure to keep adequate records of its sales. MN's original tax appeal raises three issues, which the Court consolidates and restates as:

1. Did the Department properly assess GCET when MN did not identify whether an organization was qualified?

2. Did the Department properly assess MN with a civil penalty for failure to keep adequate records of its sales of gaming items?

The Court answers both questions in the affirmative and, for the reasons explained below, finds against MN.

## FACTS AND PROCEDURAL HISTORY

In 1990, the General Assembly enacted the Charity Gaming Act (the "Act") to allow charitable and other non-profit organizations to conduct games of chance in order to raise funds for those organizations.[1] *See* Act of Mar. 16, 1990, Pub.L. No. 32, § 13–15, 1990 Ind. Acts 1122, 1129–33. In 1992, the legislature amended the Act in order to shift its enforcement powers, which were previously delegated to the Secretary of State, to the Department of Revenue. *See* Act of Feb. 26, 1992, Pub.L. No. 24, §§ 45–58, 1992 Ind. Acts 1960, 1992–2017. IND.CODE ANN. § 4–32–15–1 (West Supp.1999) imposes an excise tax of 10% on sales of pull-tabs, punchboards and tip boards (hereinafter referred to as gambling devices).

MN, headquartered in Muncie, Indiana, manufactures and distributes gambling devices, which are shipped across the country. (Trial Tr. at 22.) These devices were sold to both qualified and not qualified organizations. Qualified organizations are defined by IND.CODE ANN. § 4–32–6–20 (West Supp.1999) as:

a bona fide religious, educational ... or civic organization ... that:

(1) (A) operates without profit to the organization's members;

(B) is exempt from taxation under § 501 of the Internal Revenue Code; and

(C) has been continuously in existence in Indiana for at least five years ... or

(2) a bona fide political organization ... that produces exempt function income as defined in Section 527 of the Internal Revenue Code.

Qualified organizations include properly licensed hospitals, health facilities and psychiatric wards. *See id.* Not-qualified organizations consist mostly of bars, taverns and country clubs. (Trial Tr. at 6.) In order to conduct a charity gaming event, a qualified organization must obtain a license from the Department. *See* IND. ADMIN. CODE tit. 45, r. 18–2–1 (1996).[2] In addition, all qualified organizations are required to purchase their gambling devices from a licensed supplier like MN. *See id.* tit. 45, r. 18–3–2. When a qualified organization purchases gambling devices from MN, MN is required to charge them the 10% GCET. *See id.* tit. 45, r. 18–5–2. If a not-qualified organization purchases gambling devices from MN, 5% sales tax is charged. (Trial Tr. at 30.)

Typically, when a customer purchased an item from MN, MN's employees inquired as to whether the customer was purchasing on behalf of a qualified organization. If they were, MN charged the GCET; if not, sales tax was charged. Some customers often wished to pay MN in cash and further suggested to MN that no invoices be created for sales of gambling devices to them. As a result, MN charged these customers sales tax instead of GCET.

After an audit, the Department issued its Letter of Findings on November 28, 1995. MN then filed this original tax appeal on February 14, 1996. The Court held a trial on January 31, 1997, followed by oral arguments on August 1, 1997. Additional facts will be supplied as necessary.

---

1. In essence, the Act allowed these organizations to conduct Bingo and other gaming events to raise money. (Resp't. Br. at 2.)

2. Only qualified organizations could obtain licenses for charity gaming events. *See* IND. ADMIN. CODE, tit. 45, r. 18–2–1. (1996).

## ANALYSIS AND OPINION

### Standard of Review

The Court reviews final determinations of the Department de novo and is bound by neither the evidence presented nor the issues raised at the administrative level. *See* IND.CODE ANN. § 6–8.1–5–1(h) (West Supp.1999); *Tri–States Double Cola Bottling Co. v. Department of State Revenue,* 706 N.E.2d 282, 283 (Ind.Tax Ct.1999).

### Discussion

**I.  MN's cash sales to its unidentified customers.**

■ MN contends that it was not required to collect the GCET on its sales to cash-paying customers who said they were not-qualified or who wished to remain anonymous. IND.CODE ANN. § 4–32–15–2 (West Supp.1999) states that licensed entities such as MN are liable for payment of the tax at the time it "transports pull tabs, punchboards, or tip boards to qualified organizations in Indiana for resale by those qualified organizations." Also, IND. ADMIN. CODE tit. 45, r. 18–4–2(a)(1)(B) (1996) requires MN to maintain satisfactory records that include the following:

(i)  The date of sale.

(ii)  The customer name and business address.

(iii)  A full description of the item sold, including the serial numbers of the products sold.

(iv)  The quantity and sales price of each item.

(v)  The manufacturer's or distributor's license number.

(vi)  The customers' license number; [and]

(vii)  The gaming card excise tax due on the sale.[3]

■ *See* IND. ADMIN. CODE tit. 45, r. 18–4–2(a)(1)(B)(1996). Neither IND.CODE ANN. § 4–32–6–20 nor IND. ADMIN. CODE, tit. 45, r. 18–4–2(a)(1)(B) directly states that MN was required to keep records as to whether its customers were qualified. If the

provisions cited above are ambiguous, the Court will interpret them. *See Shoup Buses, Inc. v. Indiana Dep't. of State Revenue,* 635 N.E.2d 1165, 1167 (Ind.Tax Ct.1994). For the reasons explained below, the Court finds that such interpretation is not necessary in order to render a decision.

In order to determine what amount of tax to charge, it was necessary to know who MN's Indiana customers were. This information was important, for without it MN (and the Department on audit) could not determine the correct amount of tax. Since MN failed to provide this information to the Department, the Department made the assumption that MN's cash sales were to qualified customers. (Resp't. Br. at 12.)

The Court must now consider whether it was reasonable to assess the 10% GCET when MN did not provide any information identifying its cash-paying customers as required by the regulations. In determining whether GCET applied to MN's unidentified customers, the Department was not required to base its assessment solely on the information required under the regulations; rather, the Department was permitted to rely upon the best available information. *See Dav–Con, Inc. v. State Bd. of Tax Comm'rs.,* 702 N.E.2d 1137, 1142–43 (Ind.Tax Ct.1998), *review denied.*

MN presented evidence that it knew these cash paying customers from past sales and that MN honored their requests to remain anonymous. (Trial Tr. at 25, 31.) In addition, MN also contends that it had no tools available to determine the status of its Indiana customers. However, this is not the case. In 1992, the Department began compiling a list of qualified Indiana organizations. (Resp't. Br. at 9.) The list was readily available as of 1993, and copies of it could be purchased for a

---

**3.** In order to manufacture and sell gambling devices in Indiana, MN was required to ob- tain a license from the Department. *See* IND. CODE ANN. § 4–32–7–4 (West Supp.1999).

small fee. *See id.*[4] MN could also communicate with the Department via telephone concerning the status of a particular customer.[5] *Id.* Thus, not only did MN know the identity of its unidentified customers, but it also had the opportunity and ability to easily ascertain whether its unidentified customers were qualified. Therefore, it was reasonable for the Department to assume that all unidentified customers were qualified and thus owed the 10% GCET. Since MN did not identify all of its customers, as provided in IND. ADMIN. CODE, tit. 45, r.18–4–2, it was liable for the GCET on all sales to its unidentified customers.[6]

## II. The $5,000 penalty.

■ MN also challenges the Department's penalty of $5,000 for failure to comply with the reporting requirements discussed above. IND.CODE ANN. §§ 4–32–12–2, 12–3 (West Supp.1999) give the Department the power to impose civil penalties upon either a qualified organization or an individual. Such penalties include suspension of an organization's license as well as fines. *See id.* The maximum fines are: $1,000 for the first violation, $2,500 for the second, and $5,000 for each additional violation. *See* IND. ADMIN. CODE, tit. 45, r. 18–6–1 (1996); *see also id.* § 4–32–12–2.

■ IND.CODE ANN. § 4–32–12–1 (West Supp.1999) lists the grounds for the Department's imposition of penalties. Among the grounds listed are: (1) viola-

tion of a provision of a rule of the department; (2) commission of a fraud, deceit or misrepresentation; and (3) conduct prejudicial to public confidence in the department. Reasonable penalties may be imposed by ordinances and statutes when authorized in order to induce compliance with their terms. *See Whitewater Valley Canoe Rental, Inc. v. Board of Franklin County Comm'rs,* 507 N.E.2d 1001, 1009 (Ind.Ct.App.1987). Whether a penalty is reasonable or excessive must be determined in light of particular circumstances. *See id.* In *Whitewater,* Whitewater Valley committed 144 separate violations of a Franklin County ordinance. The ordinance provided for fines of up to $1,000 for each violation. However, the county chose to fine Whitewater Valley $100 for each violation, for a total of $14,400. Whitewater could have faced a $144,000 penalty. The court there held that the actual fine imposed was not excessive. *See id.*

Here, the Department fined MN $1,000 for each of five separate violations for a total of $5,000. The Department could have fined MN up to $18,500 total.[7] *See* IND. ADMIN. CODE tit. 45, r. 18–6–1. While the Court does not find that MN's violation of the reporting requirements found in IND.CODE ANN. section 4–32–12–3 constitutes a fraud on the Department, the Court does find that MN's conduct undermined the public confidence in the Depart-

---

4. The Department charged $7.50 per copy. (Resp. Br. at 9.)

5. The record does show that on two separate occasions, MN's accountant called the Department. The first call was made in July, 1992, during which a copy of the Department's list was requested. Since the law had just taken effect, the Department had not yet compiled a comprehensive list. (Trial Tr. at 63–64.) The second call was placed in 1994, in response to the Department's audit of MN. (Trial Tr. at 59–61; 63.)

6. MN chose to keep the identities of its cash-paying customers anonymous; it must now pay the GCET due for this practice. Such is the price of anonymity.

7. The Department found violations of IND. ADMIN. CODE tit. 45, r.18–4–2(a)(1)(B)(ii), (iii) and (v) (1996), as well as IND.CODE ANN. § 4–32–12–1(a)(5) (West Supp.1999). A fine of $1,000 was imposed for the first violation, which was the maximum fine available for the first violation. The second violation could have resulted in a $2,500 fine; rather, the Department chose only to assess a $1,000 penalty. The third, fourth and fifth violations could have cost MN $5,000 each. Instead, the Department imposed a $1,000 fine for each of these violations. Together, these violations could have resulted in a total fine of $18,500. The Department, however, only chose to fine MN $1,000 for each violation, for a total of $5,000. *See id.* tit. 45, r. 18–6–1.

ment. *See* IND.CODE ANN. § 4–32–12–1(a)(5) (West Supp. 1999). MN had the ability to comply with the record-keeping requirements of the regulations but chose not to. *See* supra at 8. Since the Department imposed a relatively small fine, the Court finds that the fine is not excessive and is therefore reasonable. *See White-water Valley,* 507 N.E.2d at 1009.

## CONCLUSION

For the foregoing reasons, this Court AFFIRMS the Department's final determinations in this case. The Court finds that MN should be given credit against any GCET due and owing for any sales tax previously paid by or on behalf of any taxpayer now determined to owe GCET. This cause is REMANDED to the Department for a calculation of the tax, penalty and interest due.[8]

---

**8.** According to the Department, MN's $110,333.29 tax liability reflects the 5% sales tax that MN has previously paid to the Department on behalf of its unidentified customers. (Joint Ex. 1)